Good morning, Your Honors, and may it please the Court, Peter Afrasiabi on behalf of the appellant Mavrix. Your Honors, the central reason this Court should reverse is because the copyright infringement that is occurring on Live Journal's website is not at the direction of users. It's at the direction of Live Journal, because Live Journal asks the world of users to make offerings, submissions. And Live Journal, through its W2 employee and through its moderators, then picks and chooses among those submissions, much like the New York Times editorial board. It gets submissions, and it looks at them, and it selects which ones it wants to then reproduce and publish. That act of reproducing and publishing comes after this manual, non-automatic, it's a volitional process executed by Live Journal's employee and its moderators. That is the significant difference between Live Journal and the existing DMCA immune businesses, such as YouTube and Veo, Veo being the YouTube equivalent in this circuit from This Court held in Veo, and it followed the second circuit in YouTube, that those businesses were immune because the user uploads were automatically recast by the service provider. Users put stuff up and it just got published. It's a sort of blank canvas that received stuff and published it. And so the service provider was not involved in any business transactions or any transactions with respect to that content. And so here you have a service provider that has sort of mated itself in this sort of symbiotic relationship with the using public because it has a rule that says, give us full articles, give us articles and give us pictures. Don't just give us a link to another site. We want the content. So they're asking people to deliver known, reputable sourced content. And the record's clear. They don't want my musings or your musings or anyone in this court's musings about storage. So in your view, they're not conducting storage at the direction. Correct. The users don't get to direct the storage of anything. The users just make an offering. They then decide which ones are going to be stored and reproduced. And that act is different to YouTube and Veo. YouTube and Veo, users send stuff up and it's automatically just converted. All the service provider did in those cases is simply take a file and automatically convert it so it could be then put on the website and seen by the world. And that act of software hands-off automatically reformatting something, this court said and the Second Circuit said, doesn't make it storage at the direction of the service provider. It's still... So there's just too much going on here by LiveJournal. Correct. Too much involvement by LiveJournal. Correct. If LiveJournal wanted to be a neutral conduit, which is the whole point of the DMCA, of course, is that service providers, by definition of offering virtual web pages and conduit lines for communication, necessarily as a technical matter, trip over copyright because it's a strict liability tort. And so the point is, neutral passive conduits, we don't want to entangle. But if you decide to make conscious transactional decisions, business decisions about engaging with that content, then it is no longer user-directed. And in fact, YouTube held this. This issue was before YouTube. It wasn't before this court in UMG, but it was before YouTube. And in YouTube, the Second Circuit said YouTube is immune for most of its decisions, the stuff I just mentioned to you. But there was one thing YouTube did that the Second Circuit said we have to send it back. YouTube took some of the content that was uploaded by the millions of consuming public and it picked, in this manual selection process, this volitional act of the company, it picked certain of the content in order to package up that content and syndicate it out. And the Second Circuit said that is not user-directed and we need to send it back. Well, this now is this circuit's case on that fact pattern. This is worse than that because here, they're not allowing anyone to upload anything for the world to see. They have rules that demand they get full articles and full content, and it must be of a certain kind. And then they pick which ones they want based on these rules, current, celebrity, they don't want political discourse, and they then curate a site. They've created an online niche magazine. They don't license a single piece of content. They encourage the citizenry to upload full articles, and then they want to hide behind it. Now, the narrowest basis this court could look at this fact record and say, of course, it has to go back to trial is that the W2 employee, Editor Delzer, he said, he looks at every piece of content that hits the site. He's one of the people that decides to approve publications. He necessarily, our content hit their website, my client's content hit their website. He doesn't remember whether he approved the Mavericks content or not. This is an affirmative defense upon which they bear the burden of proof. They have to prove it was user submitted. If his position is, I don't remember if I approved it or not, there's a fact issue. You can't say judgment is a matter of law when he doesn't remember. A jury could think he's lying. Second, even if you conclude that, all right, Editor Delzer can't remember, that's not enough. He or the moderators necessarily approved the content. They're the only ones that can approve content. And the moderators are agents of LiveJournal. And this is a significant error made by the district court. The district court concluded that as a matter of law, these moderators were not agents. The moderators are given LiveJournal email addresses. Editor Delzer critiques them and their performance. For example, 16 ER 3424 shows that. He gives them guidance on how to moderate these rules to make sure they get the right content up. That's 16 ER 1326. You can look at 3404 or 3424 of the same volume 16. He tells the moderators to avoid certain content from certain sites, to get more content from these, and then he reviews everything. Those moderators then are agents of LiveJournal. They are performing duties that inure to the benefit of LiveJournal. Well, the district court said they didn't qualify as agents, as a matter of law. And correct. And so our contention, Your Honor, is that you cannot say on that fact record, when people are given addresses, they're given rules to moderate, they're given direction, they're told how to perform for their master, that they are not agents as a matter of law. The most you could say is, there's a fact issue. Now, I think on this record, people who- Well, I understand what the district court said and what their argument is, is that you shouldn't read common law agency into the DMCA, this provision. The district court did say that. That's error. Fung, in the district court, did use the restatement. And the reason Fung used the restatement in the DMCA context is because the United States Supreme Court cited to the restatement in copyright, in the copyright context. Now, the Supreme Court case, of course, wasn't a DMCA case. It was before the Internet. But it looked to the restatement. And Fung then looked to the restatement. And when Fung came on appeal to this court, this court didn't disturb that. And if one steps back, what we're talking about here is tort and basic allocation of responsibility for decisions. You have to look to some body of law to decide if a human being who's executing actions and is performing, whether that human being acts or is an agent for someone else. A service provider is like a corporation. I mean, a corporation doesn't just act. It's employees or it's agents. Human beings act. Agency law is the only body of law one can look to. There is no body of other law. It struck me that if the district court erred in its determination that agency law shouldn't apply here, then there probably is a genuine factual dispute on whether these moderators qualify as agents under either actual authority or apparent authority. Correct. We absolutely agree, Your Honor. There's at a minimum a fact issue when you look at this. But you have to apply agency principles. Sure, you do. But if you don't apply agency principles, you have all sorts of people running around doing things. Well, at the first prong, whether or not they were acting at the direction, that might well be a tribal issue of fact. Well, we believe that's certainly a tribal issue of fact for this reason and for the reasons I've already mentioned, coupled with the fact that even if you were to conclude, okay, as a matter of law, these moderators are not agents. Let's just say this court affirmed that holding of the district court because we're not going to look to agency principles to figure out if people's actions bind someone else. We're not going to do it. Let's assume you did it. They are still, they're still genuine issues of material fact because they have rules that tell the public deliver certain kinds of content, sourced reputable content, which means it belongs to other people, and give it to us. And if you want to tell the public to do that, when the public delivers that content to you, you've got this sort of symbiotic relationship. It's not genuinely user delivered where you're blind to what's going on, the way YouTube and Vail are blind to what's uploaded. Anything and everything in the world gets uploaded there, no matter how fantastic it is, however banal and silly it is, long, short, repetitive, it doesn't matter. They're hands off. If you involve yourself in the determination of what content you insist be given to you, when someone gives it to you, you can't say that you weren't a participant in that. So for that reason, on the threshold 512C question, there's either a fact issue or as a matter of law, they're not entitled to safe harbor. Now, once you get past 512C, the threshold issue, we get to right and ability to control, financial benefit derived from this, and the court looks at this court's precedent in Fung. Fung concluded there were, Fung concluded there weren't even fact issues. It just as a matter of law, he derived a financial benefit and right and ability to control. Here, if not the same result, at a minimum, there's fact issues because it's identical. You have the website is the draw for the infringing activity. That's this record. I mean, it's in our brief, the sites, they get more money if they get more visitors. They took possession of the site, LiveJournal, in order to make money. That's why they took it, to get ad revenue. And just like in Fung, this court said that they had the right and ability to control because they, Fung exerted substantial activity, substantial influence on the activity of the users. Well, their rules are telling people what to give them. And then Fung went on to hold that, well, there, there was about 90% of the content was infringing, and that supports an inference that the revenue is coming from the infringing content. Well, here, the evidence given was that 84% was infringing. Fifteen percent was generously deemed non-infringing, even though it was taken from YouTube, Twitter, and other such social media sites. Only 1% of their content actually is Joe Q. Public's random musings, and that's no surprise because when you look at the record, at 7 ER 1202, 1203, and 1206, 1207, they want reputable sourced content. They don't want it from, quote, unquote, random people. Let me, yes. I want to, I want to make sure you have some time left over for rebuttal, so, as you indicated. But let me ask, can I, I just have some sort of off, offbeat questions I wanted to ask you. You're involved in, in another case that's pending before the Ninth Circuit. Yes, Your Honor, I argued. Venture content. Yes, Ventura content. Ventura content. Correct, Your Honor. I argued. That's a DMCA case too, by the way. We were alerted to that case. Is there anything in, in the issues of that case that would affect this case? I argued that appeal about a year ago. I think that, that appeal has, the central issue in that appeal was whether there was a reasonable termination policy for repeat infringers. That's not present in this case. Now, that appeal also involved actual and red flag knowledge. And the proper construction of the Veo case based on actual and red flag knowledge and this requirement of specificity. Should you have a requirement that the service provider knows of a specific infringing thing going on in its website or not? And so, it's similar in that sense. I think that's a point of overlap between the two, between the two. Okay. And one of the, in working up this case, you know, we know, I noted, Mike Lockrook and I noted that some of the documents were filed under seal in our court. I can only, I believe that's true because I believe they were, they were marked under the protective order. They are live journals, the internal email communications and the communications between Brendon Dells or their employee and some of those. So, they're not your documents? No, no. I don't think any of them. So, you don't really care if they're sealed? No. No. We don't care at all. I mean, all of this stuff we believe should be public record. Okay. The final issue, and I see I'm getting very long time, I would like to mention though is that this court should reverse and remand, but when it reverses and remands, we should be allowed discovery into the moderators because there is no blanket immunity to be impervious to even discovery so that we can go to trial because even if this court concludes they're not entitled to the safe harbor as we believe they should, as what we believe you should, we still need to interview and depose those moderators because their communications with LiveJournal go to LiveJournal's, the extent of LiveJournal's knowledge for purposes of willfulness. And so, this court shouldn't hold that there's a First Amendment right to engage in copyright infringement and be entirely immune from identification and discovery. And unless the court has any further questions, I'll try to save half a minute. Okay. Thank you. Good morning. May it please the court. Wayne Barsky for Appellee LiveJournal. My friend Mr. Afrasiabi said at the outset of his remarks that the central question here was whether or not the infringement was directed by users of the LiveJournal service and if I could correct that, the central question is actually whether or not the materials alleged to be infringing were stored on the LiveJournal service at the direction of users. That's the language of the DMCA. And on that issue, this was wholly undisputed in the court below and it is undisputed now. The very first paragraph of the appellant's responsive brief towards the end concedes that it is the users of the LiveJournal service, not the moderators and not LiveJournal, who have uploaded files that they have chosen and stored those files on the LiveJournal service. What counsel is pointing out is that there are volunteer moderators, eight of them, as well as one moderator who used to be a volunteer moderator, meaning a member of the community. These are users of the service. He used to be, Mr. Delzer, a member of that community and a volunteer. Now he's an employee. And now he's an employee doing exactly what he was doing. What different, well, so is that, does that immunize him? Of course not. It does not immunize Mr. Delzer and we've never contested the issue that Mr. Delzer's actions within the course and scope of his employment are attributable to LiveJournal. But the question is whether LiveJournal is responsible for having uploaded, chosen and photos that are at issue in this case on the LiveJournal servers. And on that issue, your honors, it is undisputed and that is why, for example, we can see this in the district court's order at 1 ER 52, that's the district court's order. And whatever may have happened after those photos were stored on the LiveJournal server, meaning reviewed by one or more moderators before being displayed to the public, doesn't deprive those photos of the status of having been stored there in the first instance by users. We can talk about users in just a minute, but how does a user send to LiveJournal photos? A user has an account. A user registers on the LiveJournal service by agreeing to LiveJournal's terms of service, which explicitly prohibit copyright infringement. And once the user is registered, they have the ability to upload files stored on their computers directly to the LiveJournal server. So a user can sit at home, pick a picture of Britney Spears they happen to have on their computer, upload that photo together with comments about it to the LiveJournal server, thereby creating a post. So in your view, once they do that, they're using the LiveJournal servers as storage? Absolutely, Your Honor. And as I said, I believe that's been conceded by Mavericks, both below and on appeal, and it was found to be undisputed in the district court. But when it gets displayed to the public, if I were to log on to LiveJournal to look at what's on the screen, there's a filtering process that takes place. Well there is certainly a process by which the moderators exclude any inappropriate materials that a user tries to upload. So if a user tries to upload pornographic materials, spam, obviously copyrighted materials, materials that are harassing or abusive in some ways, or matters or materials that are simply... So when they make that decision that we're not going to allow this to go live or whatever, for whatever lack of a better word, do they notify the person who uploaded it? I believe typically they do, and I believe in the record... How could they do that? I believe there are either emails or messages that are in the record of the case. So they're acting on behalf of LiveJournal? No, the moderator... There are nine moderators. Eight are acting on behalf of LiveJournal. Respectfully no, Judge Páez, and here is why. Because the ONTD community is one of two and a half million communities that chose to set making server space available to people who have common interests. Here it's the common interest in celebrity gossip. And so what LiveJournal does is provide the server space. What the community does is create their own website, create their own content. And the whole point of a blog hosting service like LiveJournal is to allow these types of communities or individual blogs and journals to flourish so that people can explore whatever... So you don't think these moderators act with the apparent authority of LiveJournal to exclude? No, no they don't, Judge Páez. But they certainly act with the authority of the community itself that chose to be moderated. And there is one of those moderators, Brendan Delzer, who is now a LiveJournal employee. So if he excluded any material, that would be on behalf of LiveJournal, correct? We can assume that, Judge Páez. Well, why would you assume that? He's an agent. I thought employees were agents of the employer. As long as they're working in their employment. Fair enough, Your Honor. But if I were saying that, I would say that that person is acting on behalf of the community. But when Mr. Delzer... So he's wearing two hats? In effect, yes. Because he's doing exactly what he was doing before he was ever an employee. But put that aside for a moment. Whether or not the moderators are agents is not relevant to the question of whether or not the materials were stored in the first instance on those servers by users, as to which there is no dispute, and as to which the district court found undisputed. Here's the one circumstance that might be affected by that, Your Honors. And that is whether or not, because those moderators participated in that activity, they acquired disqualifying knowledge under the DMCA. Isn't that a factual dispute here? I'm sorry, what? Isn't that a factual dispute here? There is no factual dispute here as to any disqualifying knowledge, and here is why. Because unlike the Fung case, Columbia Pictures versus Fung, that counsel referred to earlier, none of these moderators, and certainly not LiveJournal, ever solicited any content, ever tried to set up a community that specifically hewed to a particular theme. That is what Mr. Fung did. He was running a criminal enterprise, trading in first run movies and television shows, and allowing people, encouraging people, facilitating the download and upload of pirated files. That's not this case. What this case is, is you have a free space provided by LiveJournal for a community with its users uploading materials and commenting on materials and talking about those materials online. But what either red flag or actual knowledge requires for there to be disqualifying knowledge, and Your Honor, the jurisprudence of this court is clear on disqualifying knowledge. You have to have knowledge of specific instances of infringing content. For actual knowledge, there has to actually be a subjective understanding that something is infringing. For red flag knowledge, the actor must have specific knowledge of facts from which a reasonable person would conclude that infringement was objectively apparent or objectively infringing. I thought there were some copyright marks on these photos. There was not, absolutely not, Your Honor. Nothing? There were watermarks on 11, as I recall, 11 of the 40 photographs. Those watermarks did not say copyright Mavericks 2012 or whatever it might be. The 11 of those copyrights pertain to something called IsoPix. That was the watermark on it, www.isopix.com, I believe was the exact watermark. There were two photos that had a Mavericks online website watermark, where it said www.mavericksonline.com. Not one of the photographs said copyright Mavericks, whatever date it might be. And by the way, that wouldn't have been sufficient either under this court's jurisprudence, because this court has made clear repeatedly that the job of policing for copyright infringement falls squarely on the shoulders of copyright owners, not on service providers who are not in a position to make decisions about things like fair use, or whether something was injected by the copyright owner, him or herself, into the stream of commerce, or whether there is some other reason why the use of a copyrighted file is licensed. And so they have not shown any, they have directed very little attention to the issue of these 40 photos that are at issue in this case, instead seeking to paint the ONTD website as containing rampant acts of infringing content. And there was a reference to the YouTube case, and that's a great example of why the judgment below should be affirmed. In YouTube, there were internal emails from YouTube employees, and I believe it was one of the founders, estimating that 75 to 80 percent of the material on YouTube was copyright infringing material. And the court in that case found that that was insufficient to raise a triable issue as to red flag knowledge. Why? Because it wasn't with respect to specific instances of infringement. That makes sense, Your Honors, and here is why. Once a service provider has red flag or actual knowledge, it triggers a takedown obligation under the DMCA. And so if you don't know what specifically is infringing, then you don't know what to takedown. And so it would be anomalous to find that. There's one other requirement to, that could get you, where you could be accepted from the Safe Harbor, and that does not receive a financial benefit. That's correct. Now, don't you guys receive a, doesn't LiveJournal receive a financial benefit from these photographs? The statute, the answer is no. The reason is because- I mean, it's just not, I mean, there's advertising that takes place on this LiveJournal, right? Correct. Correct. And- So why doesn't that count as making money? Because what this, because- You just said it was all this community that was just out there doing this sort of sui generis. Somebody's making money here. Your Honor, if the statute said, and this is exactly our point, if the statute said that a service provider that makes money from a website that contains infringing materials is outside the scope of the Safe Harbor, I would agree with my friend, Mr. Afrasiabi. But that's not what the statute says. What the statute says is the service provider has to have a financial interest, excuse me, a financial benefit directly attributable to the infringement. And so in the Fung case, the financial interest there was not simply that he was making money on the website. The financial interest tied directly to the infringement there was that Mr. Fung was going out to advertisers and marketing the value of his website to them by pointing to those top 20 television shows and movies that could be uploaded and downloaded from his website. And what the Ninth Circuit found in that case was that the content owners, in that case Columbia Pictures and other studios, had shown that the financial benefit was tied directly to the infringement. So that is a much higher standard than simply showing that the service is making money on a site that has infringing content. And so that is why no issue is raised with respect to any disqualifying financial benefit. Before your time expires, I want to ask you the same two questions I asked your opposing counsel, which is, are you familiar with the Ventura content case? I'm not, your honor. He's counsel on it. It's another case pending up here. I'll become familiar with it. Seems to raise potentially related issues, but I don't know yet. And second, you filed a lot of documents under seal. Why did you do that? I don't think we actually filed them under seal except in the district court. Is there any reason why they should remain under seal? I'm not aware of any reason why they need to remain under seal, and I believe we actually spoke about this with counsel before. The court has changed its, we're a lot more demanding now on why, you know, when documents are filed under seal, they really shouldn't be under seal unless there's a really critical reason for them to be under seal. I don't see any reason here. Okay. All right. Thank you, counsel. Thank you, your honors. Your honors, very, very fast and critically, they're not just screening to get rid of pornography. If you look at 17 ER 3465, 13 ER 2557 to 58, their moderators sent responses to users saying, we rejected your submission, you need to include more of the article. They are not required to have the word copyright on content to have specific knowledge. When you look at the record here, 16 ER 3435, 3438, 3442, 3426, and 3411, they've had internal conversations about how what's going on is copyright infringement, how they wish the owners of the content would just not complain so much that they could post all the content because it's good for them. When their users have given full articles and copyright owners have complained, they've removed the content. Their users have then contacted them to say, why'd you remove my offering? I followed your rules. And their response, ha ha, laugh out loud, honey. That's not how copyright law works. You don't get to take full articles. And that's exactly the point. The issue before this court is massive. The question is, is it really the case that just because the first point that they received possession, custody of this content, it's because a user delivered it to them, even though it wasn't publicly broadcast when the user delivered it, unlike YouTube? Is it really the case that if a user of the public gives an online company something that's illegal, stolen material, copyrighted material, that that company can then make manual discretionary business decisions about what to do with that content, and it's forever immunized? Well, they have to meet the other test. So his main point to start with was that when a user sends the material, it gets stored. It doesn't get stored, Your Honor. Well, that's what he said. I understand that. It gets stored. It doesn't get stored. What happens to it? It evaporates? Well, no, it sits in a queue. That's the – if you go to the record at 7ER 1142-43 and 46-47, they are in a queue. Their moderators and employee then analyze them in order to accept them for reproduction and public posting on the website. That's 7ER 1138. So when they're in the queue, why aren't they stored? I don't know the answer to that question. Oh, let's assume they're stored when they're in the queue then. That's not the infringing act we're talking about. We're talking about the public reproduction and display of it. And so that's the question. If they're in some – because they're in a queue being reviewed, they're technically stored. And by the way, storage under BAO required the user to be able to access what they stored. The user here can never access their submission unless it's accepted. So it's not even storage within the way BAO talked about storage, but even if technically it's residing on their server somehow, does that mean then that they can come along and do anything they want with it? Because the first point of contact with the copyrighted content, it happened to get stored on their servers by a user. And so now it's like a money laundering scheme. The stuff's clean. We can do whatever we want with it. That's the big issue before this court. You see, they don't want to be like YouTube because YouTube accepts anything and everything. And so your website's a mess. It's filled with noise and junk. They want to curate a very specific kind of website with a very specific kind of content. They get 300 submissions a day. They pick 100 of them. That's to make an online people magazine that they don't want to pay like People Magazine does to my client and other authors for content because they want to stand behind the DMCA. And that's why this court's en banc decision in roommates is very important. Roommates, dealing with another internet immunity, said there has to be some level of parity. I mean, after all, if a user can give them anything they want and then they can decide to publish it or not publish it and they get to say, not us, it's the user, we're immune from copyright infringement, why isn't the New York Times similarly immune? I mean, if I know Judge Noonan's an author, if I send Judge Noonan's book to the New York Times and the New York Times editors publish it, Judge Noonan's copyright has been infringed when that newspaper comes out. Hands down. There's not even a question about it. The New York Times doesn't get to say, no, no, no, even though we published Judge Noonan's book, Peter Afrasiabi sent it to us, so, you know, he's the user, we're immune. The construction they're asking for creates a dramatic break between on and offline infringement. And that was never the intent of the DMCA and that's the Roommates case. Okay, you're over your time. Thank you very much, Your Honors. All right. Thank you, Counsel. Interesting case. The matter is submitted.
judges: Pregerson, Noonan, Paez